Britney Hayes,
Plaintiff in *Propria Persona*
90 Stone Blvd.
Massapequa, NY 11758
516-286-5930
flynn923@hotmail.com

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  NOV 01 2022  ★

LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
225 Cadman Plaza East; Brooklyn, NY 11201

BRITNEY HAYES

    PLAINTIFF

v.

LYNBROOK RESTORATIVE THERAPY
AND NURSING AND
1199 SEIU LABOR MANAGEMENT
INITIATIVES, INC.
    DEFENDANTS
_____/

**CV-22 6613**

CASE NO. _____

**GUJARATI, J.**

LINDSAY, M.J.

## COMPLAINT FOR DISABILITY DISCRIMINATION

    Britney Hayes ("plaintiff") sues Lynbrook Restorative Therapy and Nursing and 1199 SEIU Labor Management Initiatives, Inc. ("defendants") for violations of the Americans with Disabilities Act and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. §12101, *et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs in violation of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendment Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. § 12101, *et seq.* Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under 29 CFR Part 1630, *et seq.*

## PARTIES

1.    Plaintiff resided in Massapequa, New York at the address of 90 Stone Blvd. for all times material to the facts giving rise to the complaint.

- 1 -

2.     Lynbrook Restorative Therapy and Nursing is an "employer" within the definition of 42 U.S.C. 12111(5), with its principal place of business at 243 Atlantic Avenue, Lynbrook, New York 11563 for all times material to the facts giving rise to the complaint.

3.     1199 SEIU Labor Management Initiatives, Inc. is an "employer" within the definition of 42 U.S.C. 12111(5), with its principal place of business at 330 West 42nd Street 31st floor, New York, NY 10036 for all times material to the facts giving rise to the complaint.

## JURISDICTION AND VENUE

4.     This court has original and exclusive jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the Americans with Disabilities Act of 1990 and the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "Discrimination"; as implemented by 29 CFR Part 1630.14(b)(3), (c) & (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

5.     Venue is proper in this judicial district under 28 U.S.C. §1391 because the defendants do business in this judicial district and the acts complained of took place in this judicial district.

6.     Plaintiff timely filed a charge of Discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of October 26, 2021. Plaintiff has exhausted all administrative remedies and obtained her right to sue letter from the Equal Opportunity Employment Commission (EEOC) within the previous ninety days. A true and correct copy of which is included in Exhibit A.

7.     Plaintiff has exhausted all administrative remedies available to her.

## PLAIN STATEMENT

8.     The defendants discriminated and retaliated against plaintiff based upon disability. When the plaintiff objected, the defendants sought to impose non-job-related medical treatments and accommodations without first conducting an individualized assessment to determine if she was a direct threat.

- 2 -

## **BACKGROUND**

**9.**     Since 2021, Lynbrook Restorative Therapy and Nursing ("Lynbrook") adopted measures known collectively as its "Covid-19 Policy", which included requirements or accommodations that employees wear surgical masks, take experimental vaccines, practice isolation and segregation, submit to medical examinations, and disclose vital statistics as new conditions of employment.

**10.**     Lynbrook admits that its "Covid-19 Policy" is intended to prevent the spread of "Covid-19", which it describes as a deadly, contagious disease. The policy rests on the assumption that every employee, the plaintiff included, has or could have this disease. That is, the policy's underlying assumption is that all of its employees are simultaneously at risk and pose a risk to the health of all other employees. No provisions exist to establish through individualized assessment whether a particular employee poses any direct threat to the health of their co-workers.

**11.**     The policy imposed mitigation measures developed by the Center for Disease Control and Prevention (CDC), largely recommended for an "over-65, immune-compromised" population. Lynbrook's "Covid-19 policy" imposed these measures upon <u>all of its workers</u> without considering the individualized medical assessment of each employee's health or whether the policies were appropriate for the working population.

**12.**     Likewise, no provisions are in place which authorize the policy measures either by legal duty or by statute, thus the defendant's adoption of this policy is voluntary.  In the rush to implement the policy no oversight was given to provide the policy with any legal enforcement mechanism. The policy thus relies upon the voluntary compliance of employees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments and to refuse non-job-related medical inquiries or treatments.  A voluntary policy is not a legitimate requirement and cannot trigger compulsory termination.

**13.**     One of the mitigation measures established by Lynbrook's "Covid-19 policy" is a vaccination mandate. On the basis of compliance with this accommodation, the defendant's policy identified three types of employees: (1) vaccinated; (2) unvaccinated but with a medical or religious exemption; and (3) unvaccinated with no request for exemption.

14.    Lynbrook's policy treated the last group of employees (as opposed to the other employees that complied with the "Covid-19 Policy" or exempted themselves from it) either "as if" they carried a specific, active, infectious disease, or "as if" they had an impaired or suppressed immune system that made them prone to contracting "Covid-19". The policy regarded them as disabled with a contagious disease.

15.    It should also be noted that no provisions were included in the policy to handle employees who did not volunteer to waive their rights and who claimed exception to the defendant's "Covid-19 policy". The policy thus failed to acknowledge qualified individuals who claimed their rights under disability law and therefore are not subject to the policy or to the same requirements as the rest of the employees.

16.    The policy also asked representatives of the defendant to make repeated, non-job-related medical inquiries of employees and to impose non-job-related medical treatments on them. Medical decisions are far beyond the scope of the employer-employee relationship.

17.    The plaintiff took exception to the policy partly because the practices were unrelated to the performance of her essential job functions[1]. The policy, as mentioned previously, lacked enforceability, and rather than allow employees to make their own medical decisions, Lynbrook chose to adopt and implement its "Covid-19 Policy" through obfuscation, coercion, retaliation and interference specifically towards the "unvaccinated" employees, such as the plaintiff.

18.    When the plaintiff, as a qualified individual, exercised her right under the ADA to refuse the accommodations imposed by the "Covid-19 Policy" and gave notice that the policy discriminated against her by perceiving her as having an un-assessed disability, the defendant denied her equal access to the premises and continued to impose these unrequested accommodations.

19.    Lynbrook also retaliated against the plaintiff by interfering with her rights, imposing punitive measures including isolation and medical examinations, barring her from the workplace, withholding her pay, and ultimately terminating her employment which was directly and proximately caused by her good faith refusal to participate in the defendant's "Covid-19 Policy".

[1] 29 CFR 1630.2(n)(2) definition "Essential Function": "(i) ....the reason the position exists is to perform that function."

- 4 -

## STATEMENTS OF FACT

**20.**    Plaintiff was an employee of the defendant from April 8, 2014 until her termination on October 1st, 2021. She worked as a Licensed Practical Nurse at Lynbrook.

**21.**    In September of 2021, plaintiff's employer began enforcing a "Covid-19 Policy" upon all employees. This policy regarded plaintiff as a direct threat to the health of others without any diagnosis of her personal medical condition. Lynbrook informed plaintiff that she had to use several mitigation measures including wearing a mask, getting "Covid-19 vaccines", "testing" on a weekly basis and revealing her "vaccine status".

**22.**    Plaintiff's employer told her that she needed to submit a religious or a medical exemption to decline the "Covid-19 vaccine", so plaintiff drafted a notarized affidavit claiming her religious exemption and tried to file it with her employer on September 21, 2021, via Roxanne Jackson, the Administrator's Assistant. She immediately told plaintiff that her affidavit was insufficient and she needed to use a New York Department of Health form in order to register her claim.

**23.**    On September 28, 2021, plaintiff's employer requested that plaintiff wear a mask, test weekly, and, more recently, take a vaccine due to the mandate.

**24.**    Plaintiff's employer wanted to know her vaccine status.

**25.**    Lynbrook requested that she recorded her disability by either filling out their vaccine religious exemption form or having a vaccine shot. Plaintiff responded that she had previously submitted her legal affidavit notice of exemption which remedies her from not receiving any vaccine. Lynbrook's agents responded that exemption must be requested through their form.

**26.**    Patti Salzmann, an employee from Corporate, wrote plaintiff to inform her that the company considered her a direct threat to the safety of her coworkers and residents due to her not being vaccinated.

**27.**    Lynbrook had not performed any individualized assessment to base this conclusion on. When talking to Ms. Salzmann, plaintiff clarified that she was not complying with discriminatory policies by subjecting herself to their requirements.

**28.**     The same day, plaintiff started to be harassed, intimidated and threatened. Simmoni Grant, RN supervisor questioned her as soon as she walked into the building and asked: "Are you vaccinated?" The same day, Officers Bartlett and McGrane cited plaintiff for "trespassing" at her workplace when she came to work. Since she had a contract and was an employee, there was no evidence of a violation.

**29.**     On October 1, 2021, the harassment continued as soon as plaintiff came to work. Simmoni Grant, RN Supervisor and Michelle Madden, Staff Coordinator, asked her whether she had been vaccinated. Ms. Grant claimed that plaintiff was removed from the nursing schedule. She responded that she was on the master schedule until October 23rd, 2021, that she was contracted to work there and there was nothing given to her in writing regarding termination or paid leave off.

**30.**     A coworker informed plaintiff that after her confrontation with Ms. Grant, Michelle Madden, Staff Coordinator, rushed downstairs to falsify employment records by removing her name from being on the schedule from August 29, 2021 through October 23, 2021.

**31.**     That same day, Officers Muscarella, Pasquarello, and O'Connor cited plaintiff for "trespassing" at her workplace when she came to work. After the police escorted plaintiff out of the building, plaintiff was contacted by the Administrator of Lynbrook, Yiddi Eisen who sent her a text message saying that he was confirming that plaintiff was terminated on September 28th, 2021.

**32.**     Lynbrook falsified plaintiff's employee records because proper protocol required that plaintiff only be terminated while having a union member present to witness the termination and not by text or any other way.

**33.**     Mr. Eisen also threatened plaintiff by stating that she was prohibited from entering the building, and should she do so again, he would call the police and charges would be filed.

**34.**     Plaintiff requested a written document stating this and the reason for termination. Also, within the text message, Mr. Eisen said that he had not given any accommodation to plaintiff's request for exemption because she did not waive her rights by signing their document for religious exemption. Plaintiff did not require or request their accommodation for exemption, as her affidavit should had been sufficient.

- 6 -

**35.**    On that date, William Kee, Vice President of Union 1199, and Marissa Cooper, Union Representative left a voicemail on plaintiff's phone using harassment and coercing her by telling her to leave the building.

**36.**    On October 7, 2021, plaintiff received a termination letter that said: "This letter is being sent as a follow up to the text messages we exchanged on October 10, 2021. You are terminated as of September 28, 2021 for failure to follow the directives given to you to be considered for Covid-19 vaccine exemption."

**37.**    Lynbrook refused to recognize plaintiff's claim of exclusion from the "Covid-19 Policy" based upon claiming her rights to informed consent, to refuse an experimental medical treatment and her rights protected under the ADA to refuse non-job-related medical treatments or inquiries.

**38.**    The letter also stated that this and the "NYS Healthcare Covid-19 mandate law that went into effect on September 27, 2021" were the reasons for plaintiff's termination.

**39.**    On October 22, 2021, plaintiff received an email from Marissa Cooper, a representative from 1199 SEIU Labor Management Initiatives, Inc. ("1199 Union"), regarding her as disabled based upon documentation including vaccination records, doctors' notes, exemption application records, and all communications with plaintiff's employer concerning her vaccination status.

**40.**    Ms. Cooper also displayed that plaintiff was separated from her employment due to her failure to comply with her employer's vaccination mandate.

**41.**    She also mentioned that if plaintiff met one of three categories, she could be eligible to contest the separation.

**42.**    At the very bottom, Ms. Cooper attempted to put the burden of proof on plaintiff when she mentioned that if she wanted the Union to consider filing a grievance on her behalf, she had to submit complete supporting documentation within three calendar days.

**43.**    On October 26, 2021, plaintiff filed a charge of discrimination and harassment based upon disability with the EEOC. She claimed that her employer's "Covid-19 Policy" regarded her as disabled with a contagious disease and that her employer was also making a record of disability.

- 7 -

**44.** Plaintiff claimed that her employer made non-job-related medical inquiries and was imposing non-job-related medical treatments.

**45.** Plaintiff also stated that she had been fired in retaliation for claiming her rights protected under the ADA and that her employer refused to recognize any exclusion to its "Covid-19 policy" based upon rights protected under the ADA.

**46.** On October 27, 2021, plaintiff submitted a rebuttal to 1199 Union's notice of separation, delivered by Melissa Cooper.

**47.** The document stated that 1199 Union was participating alongside her employer and was disregarding the laws of the ADA particularly, Title I of the ADA, 29 CFR Part 1630.9(d) and 42 U.S.C. Š12112(d)(4); 29 CFR 1630.14(c).

**48.** On December 27, 2021, plaintiff submitted a letter to William Kee, Vice President of 1199 Union, Marissa Cooper, Union Representative, Yiddi Eisen, Lynbrook Restorative & Nursing Administrator, and Heidi, Director of Nursing revoking her submission for medical and religious exemption.

**49.** On August 16 2022, plaintiff received the Right to Sue letter from the EEOC.

### COUNT I. COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE ADA AS AMENDED IN 2008

**50.** Plaintiff sues the defendant, Lynbrook Restorative Therapy and Nursing, for discrimination on the basis of disability, and for prohibited actions taken on the basis of this disability under the "regarded as" prong; and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur*.

**51.** Plaintiff re-alleges each of the pertinent statements and those in her affidavit, and incorporates each herein and further alleges that this is a case of first impression.

**52.** The defendant is a covered entity as defined under 42 U.S.C. §12111(5) of the ADA.

**53.** Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, the plaintiff in this case is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the

burden of proof is upon the defendant to prove that it qualified for an exemption or exception to its legal duties to comply with the ADA. These are further expressed in this complaint.

**54.**    This is a case of "first impression" because the plaintiff has exercised her rights to medical privacy and informed consent to refuse the "Covid-19 Policy's" medical treatments. These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and Parts 1630.14(c) and (d) for the reason that these rights are <u>intangible private property rights of people</u>, and of the plaintiff specifically, and are protected by law and are not originated or granted by any statute. These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.  Plaintiff asks the question how can the "Covid policy" which is not authorized by any statute overcome established rights that form the bedrock of modern society?

**55.**    This is also a case of "first impression" because the plaintiff, in using the ADA to protect her rights,  has asked the question: how did the defendant suddenly acquire a new legal authority or legal duty to treat the plaintiff, its employee, for a disease without any medical examination or diagnosis? The answer of course is that the defendant never did acquire any such legal duty or authority.

**56.**    This is also a case of "first impression" because, while the defendant makes the noble-sounding but disingenuous claim that its "Covid-19 Policy" is intended to prevent the spread of "Covid-19", it has absolutely no financial responsibility to engage in or administer such a policy. In fact, employers may adopt a "Covid-19 Policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

**57.**    This case, for the first time, requires answers for the following questions: (1) Does the defendant have proof of any financial responsibility (insurance, etc.) to compensate anyone for becoming infected with "Covid-19" after complying with its "Covid-19 Policy"?; (2) Does the defendant have proof of any financial responsibility (insurance, etc.) to compensate anyone for suffering any adverse health consequences as a result of complying with its "Covid-19 Policy"?

**58.**    This is additionally a case of "first impression" because, if the defendant actually had the novel and *bona fide* legal right to require the plaintiff to disclose her medical records,

- 9 -

then the defendant would have the right to simply obtain the name and address of the plaintiff's physician and request such records directly from the physician. It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

59.     Finally, it must be noted that an "exceptional condition" exists with this case which must be acknowledged. If the United States District Court itself has adopted the same policies as the defendant, can the court be impartial?

60.     The defendant's "Covid-19 Policy" is a failed policy because it does not include several necessary provisions.

61.     It has no provisions for remaining compliant with disability law or addressing the needs of employees with disabilities.

62.     It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's.

63.     It lacks any authorized enforcement provisions and relies either on the plaintiff to voluntarily waive her rights to medical privacy, informed consent, and rights protected under the ADA **or** upon the defendant's willingness to force submission to the policy in exchange for disaster funding.

64.     The policy fails to provide any advice or instruction on how to conduct any individualized assessment[2].

65.     For those employees claiming rights under the ADA, the policy fails to identify that an ADA representative of the defendant will be necessary to oversee that the policy remains in compliance.

66.     In fact, the defendant's "Covid-19 Policy" completely ignores all legal duties to aid and encourage those with disabilities under the ADA.

67.     The defendant's "Covid-19 Policy" is applied in a discriminatory fashion by identifying distinct groups of employees, such as those who are "vaccinated" and those who are "unvaccinated" and treating them differently.

---

2     29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

**68.** The policy identifies one group of employees who claim to be exempted from the policy for medical or religious reasons but ignores the group of employees who invoke their rights under the ADA and are in a protected class.

**69.** The defendant presumes that it "somehow" acquired the legal duty and legal authority to cure or treat the un-assessed disability by imposing the policy measures upon the plaintiff.

**70.** The defendant claims that its "Covid-19 Policy" is a legitimate requirement, which authorizes termination for non-compliance, yet the defendant fails to act under any legal authority or legal duty to impose its policy measures on employees. Simply claiming that a policy is "mandatory" or "required" does not automatically make it compulsory or legitimate.

**71.** The plaintiff is regarded as having a disability by the defendant's "Covid-19 Policy", which, according to the defendant, was intended to prevent the spread of the contagious disease known as "Covid-19".

**72.** Although the plaintiff is not required by law to discuss the nature of an un-assessed disability she was assumed to have, for clarity's sake she alleges that the defendant's policy rested on the assumption that every employee, the plaintiff included, had or could have this disease. That is, the policy's underlying assumption was that all of its employees were simultaneously at risk and also posed a risk to the health of all other employees.

**73.** It is undisputed that the defendant openly admitted that the purpose of such policy was the prevention of the spread of "Covid-19". The defendant's "Covid-19 Policy" regarded the plaintiff as having "Covid-19" or being prone to getting infected with "Covid-19". All mitigation measures flowed from this premise; but the defendant terminated the plaintiff specifically for not being "vaccinated".

**74.** It is not necessary to allege that the defendant's agents personally regarded the plaintiff as having a disability, the defendant's "Covid-19 Policy" clearly demonstrates that the defendant sought to impose the policy's provisions upon the plaintiff based upon the pure speculation, stereotype and generalization that she was infected or may in the future become infected with a deadly, contagious disease (e.g. "Covid-19").

## NON-JOB-RELATED MEDICAL INQUIRIES

**75.** The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**76.** The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b)

**77.** The defendant's "Covid-19 Policy" imposed certain non-job-related medical inquiries ("accommodations") on the plaintiff including, but not limited to: disclosing private medical records and medical history; and disclosing vital statistics, like body temperature, which are a diagnostic tool of physicians but are not a diagnosis in and of themselves.

**78.** The defendant's "Covid-19 Policy" imposed submitting to medical tests[3] which are a diagnostic tool of physicians but are not a diagnosis in and of themselves. This practice results in the absurd situation of relying upon a lay-man's "self-diagnosis" based upon interpreting one piece of data rather than upon a physician's professional finding.

**79.** The defendant also assumes that its policy was the proper treatment to mitigate the effects of "Covid-19" in the workplace. The defendant's "Covid-19 Policy" imposed certain non-job-related medical treatments including, but not limited to: taking experimental vaccines; wearing a surgical mask over the face; engaging in "social distancing" which is a euphemism for quarantine and isolation.

**80.** These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related; in addition the defendant is trespassing on the plaintiff's medical privacy rights, both of these issues are expressed in the ADA.

**81.** In addition, if a vaccine prevents infection and transmission of a disease as defined by modern scientific standards, why would anyone need to take a vaccine so that someone else could avoid becoming ill? A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

---

3   "Covid 19 testing" results does not verify a diagnosis of being infected with "Covid", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

**82.**     The "vaccines" demanded by the defendant are experimental because the policy was adopted during the Emergency Use Authorization (EUA) period and none of these experimental vaccines have been <u>approved</u> by the Food and Drug Administration, they have only been "authorized" for emergency use which means they are in clinical trial phase. The only "vaccine" that is FDA-<u>approve</u>d, Comirnaty, is not commercially available, should the plaintiff choose to take it.

**83.**     The "Covid-19 policy" as implemented by the defendant allowed un-skilled and unlicensed individuals to impose medical interventions upon employees because commentary on a website (e.g., CDC, EEOC, etc.) stated that such interventions might prevent a disease, even when these very websites disclaim such commentary as valid legal or medical advice.

**84.**     The defendant never provided notice of any kind to the plaintiff, advising the plaintiff as to the manner in which these medical treatments and medical inquiries were related to her essential job function. In fact, none of the accommodations were related to the plaintiff's essential job function because she was able to continue performing her essential employment duties without participating in the defendant's "Covid-19 Policy".

**85.**     The plaintiff also alleged in her testimony and in written communications[4] that the defendant's "Covid-19 Policy" was not related in any way to her essential job functions and that the defendant failed to give conspicuous notice as to the manner in which such policies were related to the plaintiff's essential job functions.

**MEDICAL PRIVACY**

**86.**     Furthermore, the defendant's policy violates 29 CFR §1630.14(c) of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status", vital statistics and "PCR"[5] medical examination history) without any regard to confidentiality. The policy includes no provision to preserve the medical privacy rights of any employee, including the plaintiff's.

---

4     A true and correct copy of which is alleged as Exhibit A.
5     Polymerase Chain Reaction

**87.**    The defendant's policy purportedly requires employees to examine themselves, and then make a self-diagnosis[6] upon which the defendant intends to rely as if such diagnosis was obtained by a licensed, qualified professional physician.

**88.**    The defendant's policy does however require employees to obtain a physician's note if they are claiming some exemption to the policy for religious or medical reasons.

**89.**    Ironically, the defendant's "Covid-19 Policy" also impairs the plaintiff's ability to perform her essential job functions by imposing mitigation measures which create a physical impairment that substantially limits the plaintiff's ability to engage in one or more major life activities, such as working, communicating with others, caring for oneself, breathing, etc.

**90.**    The defendant refused to allow the plaintiff to continue working without first submitting to its discriminatory "Covid-19 Policy".

### MEDICAL AND RELIGIOUS EXEMPTIONS

**91.**    The plaintiff was not required to request exemptions from the defendant's "Covid-19 Policy" for religious or medical reasons and in fact, was not required to request any accommodations or reasonable modifications regarding such policy because none of its provisions were related to her essential job function.

**92.**    Therefore the plaintiff had no duty to request any reasonable modification or accommodation to the defendant's "Covid-19 Policy"; however, the plaintiff was deceptively informed that she had to request a "religious or medical exemption".

**93.**    The defendant's policy did not impose any new legal duties upon the plaintiff from which she could have been exempted or needed to request exemption from.

**94.**    The plaintiff did not request any reasonable modification or accommodation to the defendant's so-called "Covid" policy; however, plaintiff was deceived into requesting a "religious exemption" which was not a meaningful accommodation.  In fact, it was intended solely to give the appearance of fairness because it was never addressed and the defendant never disclosed any qualifying criteria for such "exemption" and never disclosed the legal duty from which the plaintiff was being "exempted" as the defendant's so-called

---

[6]  "Covid 19 testing" results does not verify a diagnosis of being infected with "Covid", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold.  The tests also give many false positives when they are were not set to correct cycling according to instructions.

"Covid" policy did not impose any new legal duties upon the plaintiff from which she could have been exempted.

95.     The plaintiff was not required to discuss the nature of an un-assessed disability she was "assumed" to have; nor was she required to request any "reasonable modifications", for an un-assessed disability she was assumed to have.

96.     In actuality, the plaintiff was always protected under the ADA once she opposed the policy. She was not required to use the language of the ADA to claim this protection, however the plaintiff did specifically give notice to the defendant that she was a qualified individual who was being regarded as having a disability by the defendant's policy.

### ABSENCE OF AN INDIVIDUAL ASSESSMENT

97.     The defendant failed to conduct any individualized assessment establishing that the plaintiff's good faith refusal to participate in its "Covid-19 Policy" was a direct threat.

98.     The defendant simply punished the plaintiff for her refusal on the pure speculation that the plaintiff had a disability known as "Covid-19", or on the pure speculation that someday she might have such a disease, and on the false premise that the defendant had the legal duty and authority to protect her and everyone else from contracting such a disease (disability).

99.     Claiming that the plaintiff had a deadly contagious disease, or that she might someday become infected with such a disease, is not a defense to violating the ADA, specifically, 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and Parts 1630(c) and (d).

100.    The defendant cannot rely upon news or public announcements to determine that the plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

101.    The defendant's "Covid-19 Policy" does not include a provision for requiring an individualized assessment by a physician to determine whether the employee poses a direct threat in the first place yet it requires employees to obtain a note from their physician in order to qualify for a "medical exemption" to the policy.

102.    Is it rational to regard oneself and others as having an illness without any diagnosis, and then seek to treat everyone with the same medical intervention without any diagnosis?

- 15 -

This behavior is defined as a mental illness in the Fifth Edition of the <u>Diagnostic and Statistical Manual for Mental Health</u>.[7] The "Covid-19 Policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

### RECORD OF A DISABILITY

**103.**    The plaintiff is entitled to the protections established in the ADA under the third prong which establishes coverage when others make a "record of" of an individual's disability.

**104.**    The defendant's "Covid-19 Policy" assumes that "unvaccinated" employees who do not have a medical or religious exemption are impaired by a contagious disease that affects their respiratory system and simultaneously assume that they are impaired by a suppressed or weak immune system that makes them vulnerable to "Covid-19".

**105.**    The defendant <u>made a record of the impairment its policy is intended to treat</u>, by documenting plaintiff's "vaccination status" and via its communication, attitude and treatment of the plaintiff.

**106.**    The defendant mis-classified the plaintiff and made a record of impairment by imposing its policy upon the plaintiff without any diagnosis, but based upon pure speculation, generalization and stereotype.

**107.**    The defendant made a record of disability by classifying the plaintiff as an "unvaccinated" employee, and classifying her as needing to wear a mask, self-test, and get vaccinated, which led to barring her from workplace and thus suffering the loss of her income.

**108.**    The mitigation measures imposed by defendant's "Covid-19 policy" also create d physical impairments that substantially limited the plaintiff's ability to engage in one or more major life activities, including working, communicating and interacting with others.

**109.**    The defendant, by its own policies, attitude toward the plaintiff, written communications, method of record-keeping and general treatment of the plaintiff, created a set of facts that satisfy the criteria under the ADA's "record of" disability prong.

---

7    Factitious Disorder or Munchhausen Syndrome by Proxy.

## PLAINTIFF'S PROTECTION UNDER THE ADA

**110.**   The defendant's "Covid-19 Policy" was not uniformly or universally applied to the plaintiff once the defendant began making a record of such disability by mis-classifying the plaintiff as having an impairment which needed to be treated or cured by the defendant's "Covid-19 Policy".

**111.**   In September of 2021, the plaintiff gave notice to the defendant that she was regarded as having a disability.

**112.**   On the same date, the plaintiff gave notice to the defendant that she was a qualified individual with a disability.

**113.**   At that moment, the plaintiff was in a protected class and engaged a protected activity, and not required to participate in the defendant's so-called "Covid" policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the Americans with Disabilities Act.  See also Title 21, Chapter 9 V, Part E §360bbb–3a. "Emergency use of medical products."

**114.**   Upon giving the defendant notice that she was regarded as having a disability, the plaintiff identified herself as being within a protected group; upon claiming her rights to refuse the defendant's accommodations based upon her good faith opposition, she engaged in a protected activity.

**115.**   The defendant applied the policy to everyone equally and failed to recognize that the plaintiff (1) opposed the policy; (2) gave notice of being regarded as having a disability; (3) objected to submitting to the defendant's "accommodations", and (4) was within a protected class and engaged in a protected activity.

**116.**   The plaintiff therefore was not subject to the same "Covid-19 Policy" as everyone else who had not invoked their rights under the ADA. As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because e*veryone is required to use the stairs and the policy is applied equally to everyone.* It is clear that this is an erroneous conclusion that does not allow disability rights.

- 17 -

**EMPLOYER'S ADA EXEMPTION**

**117.**   Regarding each incident of the plaintiff's good faith refusal to accept defendant's "Covid-19 Policy" measures, and the defendant's adverse response, the plaintiff was in a protected class and engaged a protected activity, and was not required to participate in the defendant's policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the ADA.

**118.**   The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have created any undue financial hardship.

**119.**   The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have fundamentally altered its normal operations. In fact, the defendant's policy itself already did in fact fundamentally alter its normal operations.

**120.**   The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**121.**   The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b)

**122.**   The defendant failed to establish any set of facts that proved that its regarding the plaintiff as carrying the "Covid-19 disease" was transitory or minor.

**123.**   There is no established end-date when the defendant would cease regarding the plaintiff in need of mitigation. The defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that the plaintiff individually is a direct threat.

**124.**   To this day, the defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including the plaintiff.

**125.**   The plaintiff's allegations easily satisfy the elements of discrimination by showing that she falls within a protected group, that she is qualified for the position she held, that she

was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful discrimination.

**126.**   The plaintiff demands a jury trial.

WHEREFORE plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) front pay; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

## COUNT II – COMPLAINT FOR RETALIATION
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

**127.**   Plaintiff sues the defendant, Lynbrook Restorative Therapy and Nursing, for Retaliation, Coercion, interference and Intimidation and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur.*

**128.**   Plaintiff re-alleges the foregoing statements of fact and allegations from her complaint for discrimination in Count I along with her affidavit, and further alleges the following.

**129.**   Upon giving defendant notice that she was regarded as having a disability and that she was a qualified individual with a disability, the defendant began retaliating against the plaintiff by imposing punitive measures upon her for her good faith refusal to participate in the defendant's offered accommodations.

**130.**   The defendant's "Covid-19 Policy" depends solely upon getting the employee to voluntarily waive her rights to medical privacy and disclose such records through coercion and retaliation, any act by an employer designed to deter an employee from claiming their rights is an adverse employment action under the ADA and is prohibited by law.

**131.**   The defendant implemented a policy which regarded the plaintiff as disabled because of the plaintiff's unvaccinated status and when the plaintiff refused mitigation measures, the defendant responded with adverse employment actions.

**132.**   The defendant admits that refusing to disclose the plaintiff's "vaccination status" (i.e. medical records) would directly and causally result in the plaintiff's contract being either terminated or not renewed.

**133.**   Beginning from the moment she gave such notice to the defendant, the plaintiff suffered adverse employment actions[8] and the defendant continued attempting to impose its "Covid-19 Policy" upon the plaintiff. Defendant ignored and denied her claim of disability, reprimanded her, on a daily basis, for refusing its accommodations as alleged in the plaintiff's affidavit, and finally, terminated her employment as alleged in her affidavit.

**134.**   Title 29 of Part 1630.12(b) prohibits employers from retaliating against employees, namely the plaintiff for exercising and enjoying her rights under the ADA,  specifically, "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part."

**135.**   The defendant retaliated by seeking to impose its "Covid-19 Policy" upon the plaintiff in violation of its *bona fide* legal duty of care under the ADA.

**136.**   The defendant's "Covid-19 Policy" classified the plaintiff in such a way that her employment opportunities were adversely affected and limited because the defendant would not permit the plaintiff to do her job without first submitting to defendant's accommodations ("mitigation measures").

**137.**   The defendant's adverse employment actions included, but were not limited to compelling her to submit to various medical interventions such as wearing masks over her face and getting "PCR" tests; requiring her to get vaccinated as a new condition of employment, threatening her with terminating her employment, adding excessive duties to her job description without increased remuneration, accusing her of trespassing when she

---

8 Under the ADA, adverse employment actions include any actions taken which interfere the with the plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against the plaintiff for claiming their rights.

came to her workplace, and ultimately firing her. Actually, the defendant admitted that non-compliance with the vaccination mandate would result in termination of the plaintiff's employment.

**138.**   The defendant's adverse employment actions causally resulted in the plaintiff's loss of her usual income.

**139.**   The plaintiff exercised her right to refuse the defendant's Covid-19 Policy measures based upon a good faith belief that the policy did not apply to her because of the foregoing alleged failure of the defendant to establish any exemption or exception to its legal duty to comply with the ADA.

**140.**   Exercising this right is a protected activity and the defendant's "Covid-19 Policy" was not equally or universally applied to the plaintiff because she had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

**141.**   The plaintiff exercised her right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to her because the policy was not related in any way to her essential job function.

**142.**   The plaintiff exercised her right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to her because the defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to her essential job function.

**143.**   The defendant imposed pecuniary measures, adverse employment actions, upon plaintiff which included the loss or threatened loss of pay, compelled indefinite leaves of absence, and the termination of her employment, as alleged in the plaintiff's affidavit.

**144.**   Each time the plaintiff exercise her right to refuse the defendant's accommodations, she did so in good faith, and the defendant subsequently and either immediately or in a manner that was causally related to the exercise of such right, impose adverse employment actions upon the plaintiff, including but not limited to compelling her to submit to various medical interventions such as wearing masks over her face and getting "PCR" tests; requiring her to get vaccinated as a new condition of employment; forcing her to take an

unpaid leave of absence, imposing new and excessive duties, accusing her of trespassing when she came to her workplace, and threatening to terminate her employment, but not for any necessary reasons other than as an adverse employment action intended to punish her for exercising her rights.

**145.**   The defendant imposed these measures in a direct causally related manner upon the plaintiff each time she exercised her rights to refuse to participate in the defendant's "Covid-19 Policy".

**146.**   The defendant's "Covid-19 Policy", as alleged herein and described in more detail in the plaintiff's affidavit, describes a materially adverse change in the terms and conditions of employment, compared to the conditions of employment which existed prior to the defendant's implementation of it's "Covid-19 Policy".

**147.**   These changes did not simply create an inconvenience for the plaintiff, they substantially altered the manner in which she was able to do her job and interact with co-workers and substantially impaired her ability to perform her essential employment duties, and was the direct and proximate cause behind the plaintiff's loss of a job and livelihood.

**148.**   As a direct and proximate cause of plaintiff exercising her rights under the ADA to refuse in good faith the defendant's "Covid-19 Policy" measures, the defendant prevented the plaintiff from working on the premises and isolated her from other employees.

**149.**   Each of the foregoing adverse employment actions resulted from every effort the defendant undertook to coerce the plaintiff into submitting to its "Covid-19 Policy" accommodations, and each adverse employment action described herein was causally related to plaintiff's good faith refusal to comply with the defendant's policy.

**150.**   Each adverse employment action took place within moments of, and in direct response to, plaintiff's expression of her good faith refusal to comply with the defendant's policy.

**151.**   While the defendant ignorantly and illegally ignored its actual legal duties, the defendant made a record of such disability by mis-classifying the plaintiff as having an impairment that substantially limited one or more major life activities, including but not

limited to thinking, working, eating, breathing, walking, communicating and others expressed in the ADA itself, but not limited thereto.

**152.**   The defendant made such a record by adding the plaintiff's name to a list of employees who were "unvaccinated" and then keeping an actual record of the same, and by adopting its written "Covid-19 Policy" and by its attitude toward the plaintiff and the manner in which the defendant interacted and communicated with the plaintiff.

**153.**   It is not relevant whether or not the defendant denies regarding the plaintiff as having a disability, the fact is that she was regarded as having a disability, at least by the government and as demonstrated by defendant's policies, irrespective of the defendant's bad faith and contradictory denial of the same.

**154.**   These facts demonstrate the defendant's adverse employment actions derived from its "Covid-19 Policy" and its failure to comply with the ADA in fact constituted a materially adverse change in the terms and conditions of employment.

**155.**   Before the policy, the plaintiff and other employees were protected by disability law, medical privacy rights and the right to informed consent (which as explained previously are rooted in and protected by the ADA), the right to be heard, and the right to have a complaint for harassment heard impartially by the defendant, and after the defendant's adoption of its "Covid-19 Policy", all of those rights were ignored and violated in a direct and causal response to the plaintiff's exercise of her right to refuse.

**156.**   These changes were not just "disruptive" or inconvenient; they were not merely limited to include a change in plaintiff's employment duties. These changes included (actual or likely) termination of employment, isolation, demotion, decrease in wages and loss of benefits and were each causally related to each time the plaintiff chose to exercise and enjoy her rights under the ADA.

**157.**   Ultimately, the defendant did terminate the plaintiff's employment as a direct and proximate cause of her refusal to participate in the defendant's "Covid-19 Policy".

**158.**   The plaintiff was engaged in the protected activity of refusing in good faith to participate in its "Covid-19 Policy". The defendant was aware of plaintiff refusal from the

very moment she expressed that she was regarded as having a disability and began refusing to participate in its policy.

**159.**   Each time the defendant approached the plaintiff with a demand or request to submit to the terms of its "Covid-19 Policy", the defendant informed the plaintiff that she would be penalized, such as the plaintiff has previously alleged.

**160.**   Plaintiff demands a jury trial.

WHEREFORE plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) front pay; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

## COUNT III. COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE ADA AS AMENDED IN 2008

**161.**   Plaintiff sues the defendant, 1199 SEIU Labor Management Initiatives, Inc., for discrimination on the basis of disability, and for prohibited actions taken on the basis of this disability under the "regarded as" prong; and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur.*

**162.**   Plaintiff re-alleges each of the pertinent statements and those in her affidavit, and incorporates each herein and further alleges the following.

### MEDICAL PRIVACY

**163.**   Furthermore, the defendant's policy violates 29 CFR §1630.14(c) of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status", vital statistics and "PCR"[9] medical examination history) without any regard to confidentiality. The policy includes no provision to preserve the medical privacy rights of any employee, including the plaintiff's.

---

9   Polymerase Chain Reaction

**164.**   The defendant's policy purportedly requires employees to examine themselves, and then make a self-diagnosis[10] upon which the defendant intends to rely as if such diagnosis was obtained by a licensed, qualified professional physician.

**165.**   The defendant's policy does however require employees to obtain a physician's note if they are claiming some exemption to the policy for religious or medical reasons.

**166.**   Ironically, the defendant's "Covid-19 Policy" also impairs the plaintiff's ability to perform her essential job functions by imposing mitigation measures which create a physical impairment that substantially limits the plaintiff's ability to engage in one or more major life activities, such as working, communicating with others, caring for oneself, breathing, etc.

**167.**   The defendant refused to allow the plaintiff to continue working without first submitting to its discriminatory "Covid-19 Policy".

### ABSENCE OF AN INDIVIDUAL ASSESSMENT

**168.**   The defendant failed to conduct any individualized assessment establishing that the plaintiff's good faith refusal to participate in its "Covid-19 Policy" was a direct threat.

**169.**   The defendant simply punished the plaintiff for her refusal on the pure speculation that the plaintiff had a disability known as "Covid-19", or on the pure speculation that someday she might have such a disease, and on the false premise that the defendant had the legal duty and authority to protect her and everyone else from contracting such a disease (disability).

**170.**   Claiming that the plaintiff had a deadly contagious disease, or that she might someday become infected with such a disease, is not a defense to violating the ADA, specifically, 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and Parts 1630(c) and (d).

**171.**   The defendant cannot rely upon news or public announcements to determine that the plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

**172.**   The defendant's "Covid-19 Policy" does not include a provision for requiring an individualized assessment by a physician to determine whether the employee poses a direct

---

10 "Covid 19 testing" results does not verify a diagnosis of being infected with "Covid", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold.  The tests also give many false positives when they are were not set to correct cycling according to instructions.

threat in the first place yet it requires employees to obtain a note from their physician in order to qualify for a "medical exemption" to the policy.

173.   Is it rational to regard oneself and others as having an illness without any diagnosis, and then seek to treat everyone with the same medical intervention without any diagnosis? This behavior is defined as a mental illness in the Fifth Edition of the <u>Diagnostic and Statistical Manual for Mental Health</u>.[11] The "Covid-19 Policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

### RECORD OF A DISABILITY

174.   The plaintiff is entitled to the protections established in the ADA under the third prong which establishes coverage when others make a "record of" of an individual's disability.

175.   The defendant's "Covid-19 Policy" assumes that "unvaccinated" employees who do not have a medical or religious exemption are impaired by a contagious disease that affects their respiratory system and simultaneously assume that they are impaired by a suppressed or weak immune system that makes them vulnerable to "Covid-19".

176.   The defendant <u>made a record of the impairment its policy is intended to treat</u>, by documenting plaintiff's "vaccination status" and via its communication, attitude and treatment of the plaintiff.

177.   The defendant mis-classified the plaintiff and made a record of impairment by imposing its policy upon the plaintiff without any diagnosis, but based upon pure speculation, generalization and stereotype.

178.   The defendant made a record of disability by classifying the plaintiff as an "unvaccinated" employee, and classifying her as needing to wear a mask, self-test, and get vaccinated, which led to barring her from workplace and thus suffering the loss of her income.

179.   The mitigation measures imposed by defendant's "Covid-19 policy" also created physical impairments that substantially limited the plaintiff's ability to engage in one or more major life activities, including working, communicating and interacting with others.

---

[11]  Factitious Disorder or Munchhausen Syndrome by Proxy.

**180.** The defendant, by its own policies, attitude toward the plaintiff, written communications, method of record-keeping and general treatment of the plaintiff, created a set of facts that satisfy the criteria under the ADA's "record of" disability prong.

### PLAINTIFF'S PROTECTION UNDER THE ADA

**181.** The defendant's "Covid-19 Policy" was not uniformly or universally applied to the plaintiff once the defendant began making a record of such disability by mis-classifying the plaintiff as having an impairment which needed to be treated or cured by the defendant's "Covid-19 Policy".

**182.** In September of 2021, the plaintiff gave notice to the defendant that she was regarded as having a disability. On the same date, the plaintiff gave notice to the defendant that she was a qualified individual with a disability. At that moment, the plaintiff was in a protected class and engaged a protected activity, and not required to participate in the defendant's so-called "Covid" policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the Americans with Disabilities Act. See also Title 21, Chapter 9 V, Part E §360bbb–3a. "Emergency use of medical products." Upon giving the defendant notice that she was regarded as having a disability, the plaintiff identified herself as being within a protected group; upon claiming her rights to refuse the defendant's accommodations based upon her good faith opposition, she engaged in a protected activity.

**183.** The defendant applied the policy to everyone equally and failed to recognize that the plaintiff (1) opposed the policy; (2) gave notice of being regarded as having a disability; (3) objected to submitting to the defendant's "accommodations", and (4) was within a protected class and engaged in a protected activity.

**184.** The plaintiff therefore was not subject to the same "Covid-19 Policy" as everyone else who had not invoked their rights under the ADA. As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because *everyone is required to use the stairs and the policy is applied equally to everyone.* It is clear that this is an erroneous conclusion that does not allow disability rights.

### EMPLOYER'S ADA EXEMPTION

**185.**   Regarding each incident of the plaintiff's good faith refusal to accept defendant's "Covid-19 Policy" measures, and the defendant's adverse response, the plaintiff was in a protected class and engaged a protected activity, and was not required to participate in the defendant's policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the ADA.

**186.**   The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have created any undue financial hardship.

**187.**   The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have fundamentally altered its normal operations. In fact, the defendant's policy itself already did in fact fundamentally alter its normal operations.

**188.**   The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**189.**   The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b)

**190.**   The defendant failed to establish any set of facts that proved that its regarding the plaintiff as carrying the "Covid-19 disease" was transitory or minor.

**191.**   There is no established end-date when the defendant would cease regarding the plaintiff in need of mitigation. The defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that the plaintiff individually is a direct threat.

**192.**   To this day, the defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including the plaintiff.

**193.**   The plaintiff's allegations easily satisfy the elements of discrimination by showing that she falls within a protected group, that she is qualified for the position she held, that she

was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful discrimination.

194.   The plaintiff demands a jury trial.

WHEREFORE plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) front pay; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

**COUNT IV – COMPLAINT FOR RETALIATION
IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

195.   Plaintiff sues the defendant, 1199 SEIU Labor Management Initiatives, Inc., for Retaliation, Coercion, interference and Intimidation and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur.*

196.   Plaintiff re-alleges the foregoing statements of fact and allegations from her complaint for discrimination in Count III along with her affidavit, and further alleges the following.

197.   Upon giving defendant notice that she was regarded as having a disability and that she was a qualified individual with a disability, the defendant began retaliating against the plaintiff by imposing punitive measures upon her for her good faith refusal to participate in the defendant's offered accommodations.

198.   The defendant's "Covid-19 Policy" depends solely upon getting the employee to voluntarily waive her rights to medical privacy and disclose such records through coercion and retaliation, any act by an employer designed to deter an employee from claiming their rights is an adverse employment action under the ADA and is prohibited by law.

**199.**   The defendant implemented a policy which regarded the plaintiff as disabled because of the plaintiff's unvaccinated status and when the plaintiff refused mitigation measures, the defendant responded with adverse employment actions.

**200.**   The defendant admits that refusing to disclose the plaintiff's "vaccination status" (i.e. medical records) would directly and causally result in the plaintiff's contract being either terminated or not renewed.

**201.**   Beginning from the moment she gave such notice to the defendant, the plaintiff suffered adverse employment actions[12] and the defendant continued attempting to impose its "Covid-19 Policy" upon the plaintiff. Defendant ignored and denied her claim of disability, reprimanded her, on a daily basis, for refusing its accommodations as alleged in the plaintiff's affidavit, and finally, terminated her employment as alleged in her affidavit.

**202.**   Title 29 of Part 1630.12(b) prohibits employers from retaliating against employees, namely the plaintiff for exercising and enjoying her rights under the ADA,  specifically, "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part."

**203.**   The defendant retaliated by seeking to impose its "Covid-19 Policy" upon the plaintiff in violation of its *bona fide* legal duty of care under the ADA.

**204.**   The defendant's "Covid-19 Policy" classified the plaintiff in such a way that her employment opportunities were adversely affected and limited because the defendant would not permit the plaintiff to do her job without first submitting to defendant's accommodations ("mitigation measures").

**205.**   The defendant's adverse employment actions included, but were not limited to compelling her to submit to various medical interventions such as wearing masks over her face and getting "PCR" tests; requiring her to get vaccinated as a new condition of employment, threatening her with terminating her employment, adding excessive duties to her job description without increased remuneration, accusing her of trespassing when she

---

12 Under the ADA, adverse employment actions include any actions taken which interfere the with the plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against the plaintiff for claiming their rights.

came to her workplace, and ultimately firing her. Actually, the defendant admitted that non-compliance with the vaccination mandate would result in termination of the plaintiff's employment.

**206.** The defendant's adverse employment actions causally resulted in the plaintiff's loss of her usual income.

**207.** The plaintiff exercised her right to refuse the defendant's Covid-19 Policy measures based upon a good faith belief that the policy did not apply to her because of the foregoing alleged failure of the defendant to establish any exemption or exception to its legal duty to comply with the ADA.

**208.** Exercising this right is a protected activity and the defendant's "Covid-19 Policy" was not equally or universally applied to the plaintiff because she had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

**209.** The plaintiff exercised her right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to her because the policy was not related in any way to her essential job function.

**210.** The plaintiff exercised her right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to her because the defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to her essential job function.

**211.** The defendant imposed pecuniary measures, adverse employment actions, upon plaintiff which included the loss or threatened loss of pay, compelled indefinite leaves of absence, and the termination of her employment, as alleged in the plaintiff's affidavit.

**212.** Each time the plaintiff exercise her right to refuse the defendant's accommodations, she did so in good faith, and the defendant subsequently and either immediately or in a manner that was causally related to the exercise of such right, impose adverse employment actions upon the plaintiff, including but not limited to compelling her to submit to various medical interventions such as wearing masks over her face and getting "PCR" tests; requiring her to get vaccinated as a new condition of employment; forcing her to take an

unpaid leave of absence, imposing new and excessive duties, accusing her of trespassing when she came to her workplace, and threatening to terminate her employment, but not for any necessary reasons other than as an adverse employment action intended to punish her for exercising her rights.

213.   The defendant imposed these measures in a direct causally related manner upon the plaintiff each time she exercised her rights to refuse to participate in the defendant's "Covid-19 Policy".

214.   The defendant's "Covid-19 Policy", as alleged herein and described in more detail in the plaintiff's affidavit, describes a materially adverse change in the terms and conditions of employment, compared to the conditions of employment which existed prior to the defendant's implementation of it's "Covid-19 Policy".

215.   These changes did not simply create an inconvenience for the plaintiff, they substantially altered the manner in which she was able to do her job and interact with co-workers and substantially impaired her ability to perform her essential employment duties, and was the direct and proximate cause behind the plaintiff's loss of a job and livelihood.

216.   As a direct and proximate cause of plaintiff exercising her rights under the ADA to refuse in good faith the defendant's "Covid-19 Policy" measures, the defendant prevented the plaintiff from working on the premises and isolated her from other employees.

217.   Each of the foregoing adverse employment actions resulted from every effort the defendant undertook to coerce the plaintiff into submitting to its "Covid-19 Policy" accommodations, and each adverse employment action described herein was causally related to plaintiff's good faith refusal to comply with the defendant's policy.

218.   Each adverse employment action took place within moments of, and in direct response to, plaintiff's expression of her good faith refusal to comply with the defendant's policy.

219.   While the defendant ignorantly and illegally ignored its actual legal duties, the defendant made a record of such disability by mis-classifying the plaintiff as having an impairment that substantially limited one or more major life activities, including but not

limited to thinking, working, eating, breathing, walking, communicating and others expressed in the ADA itself, but not limited thereto.

220.    The defendant made such a record by adding the plaintiff's name to a list of employees who were "unvaccinated" and then keeping an actual record of the same, and by adopting its written "Covid-19 Policy" and by its attitude toward the plaintiff and the manner in which the defendant interacted and communicated with the plaintiff.

221.    It is not relevant whether or not the defendant denies regarding the plaintiff as having a disability, the fact is that she was regarded as having a disability, at least by the government and as demonstrated by defendant's policies, irrespective of the defendant's bad faith and contradictory denial of the same.

222.    These facts demonstrate the defendant's adverse employment actions derived from its "Covid-19 Policy" and its failure to comply with the ADA in fact constituted a materially adverse change in the terms and conditions of employment.

223.    Before the policy, the plaintiff and other employees were protected by disability law, medical privacy rights and the right to informed consent (which as explained previously are rooted in and protected by the ADA), the right to be heard, and the right to have a complaint for harassment heard impartially by the defendant, and after the defendant's adoption of its "Covid-19 Policy", all of those rights were ignored and violated in a direct and causal response to the plaintiff's exercise of her right to refuse.

224.    These changes were not just "disruptive" or inconvenient; they were not merely limited to include a change in plaintiff's employment duties. These changes included (actual or likely) termination of employment, isolation, demotion, decrease in wages and loss of benefits and were each causally related to each time the plaintiff chose to exercise and enjoy her rights under the ADA.

225.    Ultimately, the defendant did terminate the plaintiff's employment as a direct and proximate cause of her refusal to participate in the defendant's "Covid-19 Policy".

226.    The plaintiff was engaged in the protected activity of refusing in good faith to participate in its "Covid-19 Policy". The defendant was aware of plaintiff refusal from the

very moment she expressed that she was regarded as having a disability and began refusing to participate in its policy.

227.   Each time the defendant approached the plaintiff with a demand or request to submit to the terms of its "Covid-19 Policy", the defendant informed the plaintiff that she would be penalized, such as the plaintiff has previously alleged.

228.   Plaintiff demands a jury trial.

WHEREFORE plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) front pay; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.


DATED this ___ day of October, 2022.


_____
Britney Hayes,
Plaintiff in *propria person*

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Britney Hayes

**DEFENDANTS**
LYNBROOK RESTORATIVE THERAPY
AND NURSING

**FILED**
U.S. DISTRICT COURT E.D.N.Y.

NOV 01 2022 ★

BROOKLYN OFFICE

**(b)** County of Residence of First Listed Plaintiff    Nassau
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Nassau
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro Se

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane    [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability    Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander    [ ] 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | Liability    Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine    [ ] 368 Asbestos Personal Injury Product | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 345 Marine Product Liability    Liability | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle    **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability    [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury    [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability |    [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice    [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights    **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting    [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment    [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations    [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [x] 445 Amer. w/Disabilities - Employment    [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other    **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education    [ ] 540 Mandamus & Other [ ] 550 Civil Rights [ ] 555 Prison Condition [ ] 560 Civil Detainee - Conditions of Confinement | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title I of the Americans with Disabilities Act

Brief description of cause:
Discrimination and Retaliation under the ADA

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE

DOCKET NUMBER

DATE
10/31/2022

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

JS 44 Reverse (Rev. 04/21)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.  10/31/2022



# UNITED STATES POSTAL SERVICE®

**PRIORITY MAIL EXPRESS**

## MAILING ENVELOPE
FOR DOMESTIC AND INTERNATIONAL USE



To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP



PS10000132900

**FOR DOMESTIC AND**
**PLACE MAILING**

- Guaranteed delivery date.*
- Guaranteed delivery time.†
- USPS Tracking® service included and many international destinat
- Pick up available.
- Domestic shipments include $10

---

## UNITED STATES POSTAL SERVICE®

**PRIORITY MAIL EXPRESS**

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)     PHONE ( )

Britney Hayes
90 Stone Blvd
Massapequa NY 11758



**DELIVERY OPTIONS (Customer Use Only)**

☑ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)     PHONE ( )

United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn NY 11201

ZIP + 4® (U.S. ADDRESSES ONLY)
11701

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

EP13C July 2
OD: 15 x 11.0

⮕ PEEL FROM THIS CORNER

LABEL 11-B, MAY 2021     PSN 7690-02-000-9996

---



# UNITED STATES POSTAL SERVICE®     Retail

**E**

**US POSTAGE PAID**
**$28.65**

Origin: 11701
10/31/22
3501900701-04

**PRIORITY MAIL EXPRESS 1-DAY®**

BRITNEY HAYES                          2 Lb 3.00 Oz
90 STONE BLVD
MASSAPEQUA NY 11758-6972              **1007**

SCHEDULED DELIVERY DAY: 11/01/22 06:00 PM

SHIP
TO:
UNITED STATES DISTRICT COURT
225 CADMAN PLZ E
BROOKLYN NY 11201-1832

C030

**USPS TRACKING #**

9570 1139 0017 2304 7131 62



---

| ORIGIN (POSTAL SERVICE USE ONLY) | | | |
|---|---|---|---|
| PO ZIP Code | ☐ Military | ☐ DPO | |
| 11701 | Scheduled Delivery Date (MM/DD/YY) 11/1/22 | Postage $ 28.65 | |
| Date Accepted (MM/DD/YY) 10/31/22 | Scheduled Delivery Time ☐ 12 Noon ☑ 3:00 PM | Insurance Fee $ | COD Fee $ |
| Time Accepted 187 ☐ AM ☐ PM | | Return Receipt Fee $ | Live Animal Transportation Fee $ |
| Special Handling/Fragile $ | Sunday/Holiday Premium Fee $ | Total Postage & Fees $ 28.65 | |
| Weight 2 lbs. 3 ozs. | ☐ Flat Rate | Acceptance Employee Initials | |
| DELIVERY (POSTAL SERVICE USE ONLY) | | | |
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature | |
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature | |

**UNITED STATES POSTAL SERVICE®**

**DuPont™ Tyvek®**
Protect What's Inside.™

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13C © U.S. Postal Service; July 2022; All rights reserved.